# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

KEVIN F.,[1]

                                  Plaintiff,

       v.                                5:18-CV-1454
                                           (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.

---

HOWARD D. OLINSKY, ESQ., for Plaintiff
DANIEL TARABELLI, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 7).

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on July 9, 2015,[2] alleging disability beginning July 9, 2015. (Administrative Transcript ("T") at

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] The court notes that plaintiff's initial denial states that the "filing date" of plaintiff's application was March 19, 2015, even though plaintiff's brief states that the application was July 9, 2015. (T. 85; Pl.'s Br. at 1 (Dkt. No. 9)). The discrepancy is not relevant to this court's decision.

77-78).  His application was denied initially on October 15, 2015. (T. 85).  Plaintiff requested a hearing, which was conducted by video conference by Administrative Law Judge ("ALJ") Paul D. Barker, Jr. on October 11, 2017, at which plaintiff and Vocational Expert ("VE" ) Jennifer Guediri testified. (T. 34-76).

In a decision dated November 6, 2017, the ALJ found that plaintiff was not disabled. (T. 18-27).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on October 24, 2018. (T. 1-6).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of

review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   FACTS

Plaintiff was 51 years old at the time of the ALJ's hearing and 49 at the alleged date of onset. He has a high-school education. (T. 39). Plaintiff was married and lived with his wife. (T. 77, 37-38). His past relevant work was as a boilermaker, which involved a great deal of heavy lifting and postural changes. (T. 40-46). Plaintiff's application alleged disability due to "arthritis neck and back," "bone spurs," and

"narrowing of the spine." (T. 77).

At the ALJ's hearing, plaintiff testified that he was unable to work due to the severe pain in his lower back and the pain in his neck. (T. 46). He stated that the lower back pain was worse, and that he could not sit or stand for long periods of time. (T. 46, 48). Specifically, he testified that he could sit for "maybe two hours at the most," and that "standing varies . . . [m]aybe an hour." (*Id.*) Plaintiff also testified that he had "troubles" in his left knee, but "nothing that has been medically diagnosed," and "moderate carpal tunnel in [his] left hand," which "hurts." (T. 47). Plaintiff stated that his back pain was "constant," while his neck pain was "not always there," but did bother him. (T. 48). Some days were "better than others." (*Id.*)

Plaintiff testified that he had difficulty sleeping because he could not find a comfortable position, and that his arms would "fall asleep."[3] (T. 50). He stated that he took medication for the pain, had tried physical therapy, had "injections" in both his neck and back, and tried a TENS Unit. (T. 50-51) Plaintiff testified that none of the treatments gave him relief. (*Id.*) He spoke to a doctor about surgery, but that the doctor did not recommend it, based on the failure of the injections. (T. 51-51).

Plaintiff stated that he could lift "[a] gallon of milk . . . naturally, and "probably five [or] ten pounds." (T. 55). He stated that he did not have difficulty with his hands "for the most part," although they sometimes "go to sleep," and that bothered him "as far as lifting." (*Id.*) Plaintiff stated that he could walk a block or two without stopping. (*Id.*)

---

[3] Later, plaintiff testified that he also had sleep apnea and used a CPAP machine. He stated that the machine did not always work, but "work[ed] more times than not." (T. 57).

During the day, plaintiff used the computer for "a little bit," watched television, went outside to sit for a little while, but then had to lay in bed and rest for a while.[4] (*Id.*) He had dogs, but had not taken them for a walk in a long time; and he occasionally went to the grocery store or walked to his brother-in-law's home, which was about a block away. (T. 56). Plaintiff's wife did most of the household chores, but occasionally, plaintiff would cook a small, simple meal. (*Id.*) He hired someone to cut the grass and remove snow for him. (*Id.*) Plaintiff testified that his pain "sometimes" affected his ability to concentrate on a task such as reading a book or watching television. (T. 60-61). He stated that his neck pain often caused "severe headaches" in the back of his neck approximately two or three times per week. (T. 62).

The ALJ heard testimony from VE Jennifer Guediri. (T. 66-73). She testified that plaintiff's past relevant work ("PRW") as a boilermaker was "heavy," and was "very heavy" as plaintiff performed it. (T. 66-67). There were no skills transferable to either the light or sedentary level from plaintiff's PRW. (T. 67). The ALJ asked the VE to assume an individual who could perform "a range of light work" as defined in the Social Security Regulations, except that the individual could stand, walk, or sit for six hours in an eight-hour day; and could occasionally stoop, climb ramps and stairs, balance, kneel, crawl, and crouch. (T. 67-68). The individual could never climb ladders, ropes, or scaffolds. (T. 68).

The VE stated that such an individual could not perform the plaintiff's PRW, but could perform other work existing in substantial numbers in the national economy. (T.

---

[4] Plaintiff later testified that he usually took a "rest" in the morning and in the afternoon which involved getting in bed for "two to three hours." (T. 63).

68-69). The ALJ then asked the VE to include the additional restriction, requiring the individual to have "the option to sit at the workstation and continue working for ten minutes seated after every hour of standing." (T. 70). The VE testified that only one of the previously mentioned jobs - sorter - would be available to an individual with such restrictions because it could be performed "sitting or standing at a workstation." (T. 70).

While the other two positions first mentioned by the VE would no longer be available to this individual, the VE testified that there were other jobs available that could be performed in either a seated or a standing position. (T. 70-71). These jobs were "marker" and "parking attendant." (T. 71). The VE specifically stated that, although the Dictionary of Occupational Titles ("DOT") did not mention the ability to alternate sitting and standing as part of the descriptions of the three jobs, the VE was testifying "based on [her] observation of the job," and based on speaking to employers about the requirements of such jobs. (T. 70). However, the VE testified that if an individual were to be off-task for up to 20% of the work day, "[t]hat would rule out work."

The ALJ also asked the VE another hypothetical question "at the sedentary level." (T. 72). This question involved an individual who could perform "a range of sedentary work," except that the individual could lift, carry, push, and pull ten pounds occasionally; and could sit for six hours and stand and walk for two hours in an eight-hour day. (*Id.*) The individual could occasionally climb ramps and stairs, kneel, crawl, crouch, and balance, but could never climb ladders, ropes, and scaffolds. (*Id.*) The VE

testified that such an individual could perform the jobs of security or ID clerk,[5] table worker, and final assembler. (*Id.*)

The plaintiff and the ALJ have outlined the relevant medical evidence in this case. (T. 22-24; Pl.'s Br. at 3-7). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   THE ALJ'S DECISION

At step one of the sequential analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. (T. 20). At step two, the ALJ found that plaintiff suffered from the severe impairments of degenerative disc disease of the cervical and lumbar spines and carpal tunnel syndrome. (T. 20-21). The ALJ also found that plaintiff's sleep apnea, left knee pain, and depression were not severe. (*Id.*) At step three, the ALJ found that plaintiff's severe impairments did not meet or equal the severity of listed impairments. (T. 21). In doing so, the ALJ considered Listing 1.04 (Disorders of the Spine) and Listing 11.04 (Neurological Disorders). (*Id.*)

At step four of the sequential evaluation, the ALJ found that plaintiff had the RFC to perform light work, except that the plaintiff could stand, walk, or sit for six hours of an eight-hour work day; could occasionally stoop, climb ramps and stairs, balance, kneel, crawl, and crouch; but could never climb ladders, ropes, or scaffolds. (*Id.*) Plaintiff would require the option to sit at his workstation and continue working

---

[5] The VE testified that although, according to the DOT, the ID clerk position was "semi-skilled," the job would "actually take less than one month to learn . . . ." (T. 73).

for ten minutes in a seated position after every hour of standing. (*Id.*)  In making this determination, the ALJ discussed the medical evidence and gave relative weight to the medical opinions of record. (T. 22-24).

Based on the above RFC, the ALJ found that plaintiff could not perform his PRW; but based on the VE's testimony, the plaintiff could perform the "representative" jobs of "marker," "parking attendant," and "sorter," all of which existed in significant numbers in the national economy. (T. 25-26).  The ALJ specifically stated that although the VE's testimony was "inconsistent with the information contained in the [DOT], there was a "reasonable explanation for the discrepancy." (T. 26).  Although, the existence of jobs which allowed the plaintiff to "alternate between sitting and standing at intervals during the workday" was not addressed in the DOT, the VE based her opinion on observations and statements from employers, obtained during her 25-year professional experience, performing vocational evaluation and job placement. (*Id.*)  Because of the above findings, the ALJ found that plaintiff is not disabled for purposes of Social Security. (T. 26-27).

## V.  ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.  The ALJ's RFC determination is not supported by substantial evidence because "mischaracterized" the evidence and failed to explain his rejection of plaintiff's two treating physicians. (Pl.'s Br. at 9-20).

2.  The ALJ's RFC determination is not supported by substantial evidence because he failed to incorporate plaintiff's cervical disc disease and carpal tunnel syndrome into the RFC after finding these two impairments severe. (Pl.'s Br. at 20-21).

3.  Plaintiff's case should be remanded because it was adjudicated by an "unconstitutionally appointed ALJ. (Pl.'s Br. at 21-25).

Defendant argues that the Commissioner's disability determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 3-13). Defendant also contends that plaintiff has waived any argument that the ALJ was improperly appointed. (Def.'s Br. at 14-25).

## VI.  **Appointment of ALJ**

### A.  **Legal Standards**

In *Lucia v. Securities & Exch. Comm'n*, the Supreme Court held that the Securities and Exchange Commission ALJs are "'[o]fficers of the United States,' subject to the Appointment Clause." *Lucia v. S.E.C.*, __ U.S. __,138 S. Ct. 2044, 2055 (2018). District Courts have since applied *Lucia* to Social Security Administration ALJs and have required their appointment to conform with the Appointments Clause of the United States Constitution. *See Williams v. Berryhill*, No. 17-CV-1660, 2019 WL 1271647, at *6 (E.D.N.Y. Mar. 19, 2019); *Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 349-350 (S.D.N.Y. 2019).

However, in *Lucia*, the Court specifically stated that one is only entitled to relief if the challenge to the constitutional validity of the appointment of the adjudicating officer is ***timely***. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 182-83 (1995) (emphasis added)). In interpreting the meaning of a timely challenge, courts have held that "'Social Security claimants are entitled to a *Lucia* rehearing, only if they raised their Appointments Clause arguments during their agency hearing or appeal.'" *Demoranville v. Saul*, No. 3:18-CV-1930, 2019 WL 6712056, at *1

(D. Conn. Dec. 10, 2019) (quoting *Johnson v. Berryhill*, No. 3:17-CV-165, 2019 WL 1430242, at *14 (D. Conn. Mar. 29, 2019) (citing cases)). Although several district courts in the Second Circuit have adopted this holding, the Second Circuit has not spoken on the issue. *See Bonilla-Bukhari*, 357 F. Supp. 3d at 349-50 (citations omitted).

## B.    Application

Plaintiff does not dispute that he failed to raise his argument at the administrative level.[6] Instead he argues that he is not required to exhaust this claim or that his waiver should be excused, based upon cases decided in Nebraska, Pennsylvania, and North Carolina, which held that a plaintiff was not required to bring such a challenge either to the ALJ or to the Appeals Council. (Pl.'s Br. at 23-25) (citing *Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at *8 (D. Neb. Dec. 6, 2018); *Bizarre v. Berryhill*, No. 1:18-CV-48, 2019 WL 1014194, at *3 (M.D. Pa. Mar. 4, 2019); *Cluclasure v. Comm'r of Soc. Sec.*, No. 18-CV-1543, 2019 WL 1641192, at *6 (E.D. Pa. Apr. 16, 2019); *Bradshaw v. Berryhill*, __ F. Supp. 3d __, 2019 WL 1510953 (E.D.N.C. Mar. 26, 2019)).

*Bizarre* has since been published at 364 F. Supp. 3d 418 (M.D. Pa. 2019), and an appeal has been docketed, No. 19-1773 (3d Cir.). Notices of appeal were also filed in

---

[6] The court notes that, on July 16, 2018, the Acting Commissioner of Social Security ratified the appointments of all SSA ALJs and approved those appointments as her own, thereby remedying the issue identified in *Lucia*. *Dibiase v. Saul*, No. 3:19-CV-68, 2019 WL 5495269, at *4 (D. Conn. Oct. 25, 2019) (citing Social Security Emergency Message (EM) 18003 REV 2, § B (available at: https://secure.ssa.gov/apps10/reference.nsf/links/08062018021025PM); Social Security Ruling 19-1p, 2019 WL 1324866 (S.S.A. Mar. 15, 2019)). Although plaintiff states in a footnote that it is not clear whether an Acting Commissioner has the authority to appoint inferior officers, and "it appears that all ALJs at SSA may remain unconstitutionally appointed," (Pl.'s Br. at 23 n.3), this argument does not affect this court's decision that plaintiff waived the issue by failing to raise it while his claim was pending before the agency.

*Cluclasure* and other Pennsylvania district court actions, and the appeals were consolidated. *See Anderson v. Saul*, No. 19-2283, 2019 WL 6769962, at *5 n.7 (E.D. Pa. Dec. 12, 2019) (citations omitted). Oral argument on these appeals was heard on November 13, 2019. *See Anderson v. Saul*, No. 19-2283, 2019 WL 6769962, at *5 (E.D. Pa. Dec. 12, 2019) (citing cases).

The court in *Anderson* declined to follow *Bizarre*, citing to the "consolidated" appeal, and following the reasoning in *Marchant o/b/o A.A.H. v. Berryhill*, No. 18-345, 2019 WL 2268982 (E.D. Pa. May 28, 2019) and *Muhammad v. Berryhill*, 381 F. Supp. 3d 462 (E.D. Pa. 2019), which both held that the plaintiff waived the issue by failing to raise it in the administrative proceedings.

In *Thompson v. Saul*, No. 5:18-CV-489, 2019 WL 6701625, at *8 (M.D.N.C. Sept. 16, 2019, the court disagreed with the result in *Bradshaw*, finding that the plaintiff waived review of the appointment issue by failing to raise it in the agency. *Id.* In *Umbehagen v. Saul*, No. 1:18-CV-704, 2019 WL 4415149, at *11 (M.D.N.C. Sept. 16, 2019), the court stated that "since *Lucia* (and notwithstanding *Bradshaw* and *Probst*), other district courts in the Fourth Circuit overwhelmingly have rejected as forfeited challenges to the SSA's ALJs under the Appointments Clause when the plaintiff did not raise the issue while his or her claim remained pending before the SSA." *Id.* (multiple citations omitted). The court in *Umbehagen* also noted that an appeal had been filed with the Fourth Circuit in *Bradshaw*[7] and other cases. *Id.* at *8.

In *Bonilla-Bukhari*, the court noted that the "vast majority" of courts agreed with

---

[7] The appeal was filed on May 17, 2019. No. 19-1531 (4th Cir. May 17, 2019).

the rule requiring plaintiffs to raise the appointments issue in the agency before raising it in federal court. 357 F. Supp. 3d at 350 (citations omitted). Defense counsel has cited an additional and substantial number of cases supporting this finding. (Def.'s Br. at 22 n.18).

The cases endorsing an exception to the requirement that an issue be raised before the agency rely on another Supreme Court case, *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 879-80 (1991) which held that Appointment Clause challenges were deemed to be "in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Id.* The plaintiff in *Freytag* was challenging the appointment of a Special Trial Court Judge in the Tax Court. *Id.* The Court reasoned that it was "'faced with a constitutional challenge that is neither frivolous nor disingenuous," because "[t]he alleged defect in the appointment of the Special Trial Judge goes to the validity of the Tax Court proceeding that is the basis for this litigation." *Id.* at 879. The Court concluded that despite "disruption to sound appellate process entailed by entertaining objections not raised below . . . this is one of those rare cases in which we should exercise our discretion to hear petitioners' challenge to the constitutional authority of the Special Trial Judge." *Id.*

The court in *Bonilla-Bukhari* stated that, five years after *Freytag*, the Supreme Court decided *Ryder v. United States*, 515 U.S. 177 (1995). *Bonilla-Bukhari*, 357 F. Supp. 3d at 351-52. In *Ryder*, the Court found that the challenge to the constitutional appointment of the judge must be "timely." *Id.* (citing *Ryder*, 515 U.S. at 182-83). The

timeliness requirement was again emphasized in *Lucas. Id.* The plaintiffs in both *Lucia* and *Ryder* raised their claims before the agency. *Id.* The court in *Bonilla-Burkhari* quoted the following passage from *Abbington v. Berryhill*, No. 1:17-CV-552, 2018 WL 6571208, at *7 (S.D. Ala. Dec. 13, 2018):

> Finally, *Ryder's* rule that relief is due for "timely" challenges was created as an incentive "to raise Appointments Clause challenges with respect to questionable judicial appointments." *Ryder*, 515 U.S. at 182-83 . . . . Regularly permitting unsuccessful claimants to raise Appointments Clause challenges for the first time on judicial review, especially when the arguments underlying those challenges were available at the administrative level, would "encourage the practice of 'sandbagging': suggesting or permitting, for strategic reasons, that the [adjudicative entity] pursue a certain course, and later -if the outcome is unfavorable - claiming that the course followed was reversible error." *Freytag*, 501 U.S. at 895 . . . (Scalia, J., concurring in part and concurring in the judgment). Here, *Freytag* itself, decided in 1991, gave Abbington sufficient authority to raise the present Appointments Clause challenge at the administrative level.

*Id.*

Plaintiff in this case was represented by counsel at the administrative level. Contrary to plaintiff's argument that he could not have raised the issue before the agency, the court notes that *Freytag* was decided in 1991, *Ryder* was decided in 1995, and *Lucia* was decided in June of 2018. The ALJ in this case issued his decision on November 6, 2017, but the Appeals Council did not issue its decision until October 24, 2018, several months after *Lucia.* Thus, plaintiff's argument was "available" to him while his claim was pending in the agency.

Plaintiff also argues that even though the claim may have been "available," to

him, he could not raise such a claim before the ALJ or the Appeals Council because neither had the authority to consider a constitutional argument. (Pl.'s Br. at 24-25). However, plaintiff's argument is not accurate. As defense counsel points out, the Social Security Regulations contemplate that a claimant will raise even constitutional issues before the agency. *See e.g.* 20 C.F.R. 404.924(d) (providing for an expedited appeals process when a claimant alleges that "the only factor preventing a favorable determination or decision is a provision in the law that you believe is unconstitutional.") While the issue in the instant case is not a provision "in the law," clearly, the administration foresees that constitutional challenges may be made to the agency.

As defendant also points out, on March 15, 2019, the Commissioner published a Social Security Ruling ("SSR") based on the Supreme Court's decision in *Lucia*. (Def.'s Br. at 20) (citing SSR 19-1p). The SSR provides that, if the claimant has raised a "timely" challenge to the ALJ's appointment by presenting the claim to either the ALJ or to the Appeals Council, the agency would provide for additional administrative review of the claim as required by *Lucia*. *Id. See also Merchant o/b/o AAH v. Berryhill*, No. 18-345, 2019 WL 2268982, at *8 (E.D. Pa. May 28, 2019) (holding that raising the Appointment Clause claim before the agency would not have been futile). Thus, by failing to raise this issue in the agency, this court agrees that plaintiff in this case has waived consideration of the constitutionality of the ALJ's appointment. The court will now consider plaintiff's other arguments for remand.

# VII. Analysis of the Evidence

## A. Legal Standards

### 1. RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

### 2. Treating Physician

A treating physician's opinion is not binding on the Commissioner, and the opinion must be only given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*,

312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

When assigning less than "controlling weight" to a treating physician's opinion, the ALJ must "explicitly consider" the four factors listed in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (internal quotation marks omitted). Those factors are "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* at 95-96 (citation omitted). A reviewing court should remand for failure to consider explicitly the *Burgess* factors unless a searching review of the record shows that the ALJ has provided "good reasons" for her evaluation. *Id.* at 96.

### B. Application

Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence because he improperly rejected the medical opinions of plaintiff's treating physicians in favor of the "vague" opinion of a consulting examiner, and because he failed to incorporate into the RFC at step four, limitations caused by two impairments that the ALJ found to be "severe" at step two.

Plaintiff points to two medical source statements ("MSS"), the first, dated January 7, 2016, written by treating orthopedic surgeon, Dr. Stephen Robinson (T. 868-73), and the second, dated September 13, 2017, written by treating primary care physician, Dr. Carlos Dator (T. 861-65). (Pl.'s Br. at 10-11). The two MSS statements are almost identical. They both limit plaintiff to lifting only 10 pounds "occasionally"; sitting, standing, and walking "about" 2 hours per day; and needing to lie down or recline 30-60 minutes before "needing to" sit, stand, or walk. (T. 870-71 - Dr. Robinson; T. 862, 864 - Dr. Dator). Both doctors stated that the plaintiff's "reaching" was "limited bilaterally," but did not fill out any of the blanks indicating "percentage of limitation." (T. 872 - Dr. Robinson; T. 863 - Dator). Both doctors stated that the plaintiff would be "off task" more than 30% in an 8-hour workday; and would be unable to complete an 8-hour work day and would absent more than 5 days per month due to his impairments. (T. 872-73 - Dr. Robinson; T. 863, 865 - Dr. Dator). Both doctors also stated that plaintiff's pain and "stress" would interfere "constantly" with the attention and concentration needed to perform even "simple" work tasks. (T. 872 - Dr. Robinson; T. 863 - Dr. Dator). The doctors also stated that the plaintiff would be less than 50% as productive as an "unimpaired employee." (T. 872 - Dr. Robinson; T. 865 - Dr. Dator).

At the end of the MSS, there was a question related to the bases upon which the doctors based their opinions. (T. 873 - Robinson; T. 865 - Dator). The question was followed by a list of "bases," and the doctors placed "checks" next to each stated basis. (*Id.*) The last basis was "Other." Dr. Robinson stated that his MSS was based upon

"History and Medical File," and next to "Other," he hand wrote - "pt. interview," while Dr. Dator stated that his MSS was based on "History and Medical File;" "Progress and Office Notes;" "Physical Exams;" and "X-Rays, CT Scans, or MRIs." (*Id.*) Dr. Dator also completed a document, sent to him by the "Boilermakers National Health and Welfare Fund, in which Dr. Dator states that plaintiff was "disabled" from June 18, 2015 through the "present," due to his occupational illnesses and/or injuries." (T. 804).

While acknowledging that Dr. Dator and Dr. Robinson were treating physicians, the ALJ gave their MSSs limited weight because they were "neither supported, nor consistent with the medical record." (T. 24). The law is clear that notwithstanding the "treating physician rule," the ALJ may elect to give the treating physicians' opinions less weight if the ALJ gave good reasons for doing so. *Estrella, supra.* However, the ALJ need not reconcile every shred of medical evidence in order to support his opinion with substantial evidence. *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (per curiam). Conflicts in the evidence are for the ALJ to resolve. *Veino v. Barnhart*, , 312 F.3d 578, 588 (2d Cir. 2002). In addition, the ALJ's RFC determination need not "perfectly correspond with any of the opinions of the medical sources cited in his decision," and he is entitled to "weigh all of the evidence available to make an RFC finding that is consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citation omitted). That is what the ALJ did in this case.

There is no question that plaintiff has musculoskeletal impairments, confirmed by x-ray, CT Scan, and MRI. The issue is what functional limitations are caused by these impairments. Although both Dr. Dator and Dr. Robinson noted that plaintiff's

reaching was "limited bilaterally," there is no more specific information about the extent of the limitations, and none of the treatment or progress notes from either physician noted pain or limitation with reaching.

Plaintiff began seeing Dr. Dator on May 19, 2015. (T. 407-409). Although plaintiff has cervical impairments, Dr. Dator's progress notes consistently find that plaintiff had full range of motion in his cervical spine. (T. 389, 393, 396, 399, 402, 405, 408). Plaintiff's motor and sensory functions were "intact." (*Id.*) Dr. Dator's notes also indicated that no pain was elicited on examination of plaintiff's lower back, notwithstanding the clear objective evidence of some moderate and some severe radicular impingement on MRI.[8] (*Id.*) On May 10, 2017, plaintiff reported "No headaches . . . weakness in extremity, change in sensation, [or] problems with balance/gait." (T. 800; *see also* T. 388, 392, 395, 398, 401). On May 26, 2016, plaintiff told Dr. Dator that he was "doing well at present," and that his "back pain has been well-controlled with his current medications." (T. 392). Thus, the ALJ's determination that Dr. Dator's opinion was entitled to limited weight based on the inconsistency between his treatment notes and the extreme nature of the limitations listed in his MSS is supported by substantial evidence.

Based on the similarity between Dr. Dator's and Dr. Robinson's MSSs, it appears that Dr. Dator may have deferred to Dr. Robinson's opinions of plaintiff's limitations, which is justifiable because Dr. Robinson is an orthopedic surgeon and was treating

---

[8] As defendant correctly points out, plaintiff has miscited Dr. Dator's May 10, 2017 report. Dr. Dator's report states "no pain elicited on his lower back," (T. 801), while plaintiff cites this report as stating that "[e]xamination revealed pain elicited in his lower back." (Pl.'s Br. at 6) (citing T. 801).

plaintiff for his back and neck impairments. Thus, the court will turn to the ALJ's finding that Dr. Robinson's MSS is not fully supported by the evidence, which would have entitled the ALJ to give it limited weight.

Dr. Robinson's reports are much more detailed and discuss more objective findings in addition to the subjective discussion of plaintiff's limitations. Plaintiff cites the plaintiff's subjective complaints, recited in Dr. Robinson's December 16, 2014 report, in which Dr. Robinson found on physical examination that plaintiff had tenderness in the cervical spine posteriorly and bilaterally. (T. 252). Dr. Robinson also found that plaintiff's cervical range of motion was limited to 45 degrees of rotation (bilaterally), 15 degrees extension, and 30 degrees flexion. (*Id.*) However, in the same report, Dr. Robinson stated that plaintiff ambulated well, his stance was normal, and he had full motor function in both upper extremities, notwithstanding some decreased sensation. (T. 252). Dr. Robinson also found no tenderness in either shoulder and full range of motion in both shoulders. (*Id.*) In addition, the report does not mention low back pain at that time.

Plaintiff argues that Dr. Robinson, "throughout 2015," found "mild" pain with limited cervical extension, tenderness over the left and right cervical paraspinal areas, "ambulation with apparent discomfort," lower back pain with side bends, lower back pain and buttock pain with left leg raises, and decreased sensation in the left anterior thigh, dorsal foot and lateral foot with decreased sensation in the right medial calf. (Pl.'s Br. at 13). However, on January 16, 2015, plaintiff was examined by Physician Assistant ("PA") Greg Hanifin, and his examination was "acknowledged" by Dr.

21

Robinson. (T. 247-49). This report also focused only on plaintiff's cervical spine. Although plaintiff complained of paresthesia and numbness in his arms and hands, his physical examination showed normal sensation through both upper extremities with no deficits noted. (T. 249). Plaintiff appeared to be in "mild" pain, his gait was normal, and there was mild tenderness over the left and right paraspinal areas. (*Id.*) Cervical range of motion was only minimally limited in extension, and there was no sign of muscle spasm in the cervical spine. (*Id.*) Clonus[9] was absent. (*Id.*)

On January 21, 2016, on physical examination, Dr. Robinson found that plaintiff ambulated well and had a normal stance.[10] (T. 336). However, an examination of plaintiff's lumbar spine showed tenderness bilaterally. (*Id.*) Plaintiff's lumbar flexion was limited to touching his knees, and side bending was limited to 15 degrees with low back pain. (*Id.*) His "leg raising" was 90 degrees with low back pain only. (*Id.*)

On December 21, 2016, plaintiff "subjective[ly]" reported "quite severe bilateral low back pain and left leg pain radiating to posterolateral calf." (T. 332). Dr. Robinson again noted that plaintiff ambulated well, had a normal stance, and had full motor function in both lower extremities. (*Id.*) However, an examination of plaintiff's lumbar spine still showed tenderness bilaterally. (*Id.*) Plaintiff's lumbar flexion was limited to

[9] Clonus is a form of muscle spasm, involving repeated, and often rhythmic contractions. *Clonus: definition, mechanism, treatment* (Boyraz, I., et al. Med Glass (Zeneca 2015), www.nlm. nih.gov/m/pubmed/25669332. Clonus may be caused by a permanent lesion in descending motor neurons. *Id.*

[10] As defendant points out, Dr. Robinson very often found that plaintiff had good ambulation and normal stance. (T. 332, 336, 340, 344, 348, 849, 853, 857). Plaintiff cites one of the only reports by Dr. Robinson that finds difficulty with plaintiff's ambulation. These reports are from 2016 and 2017. The reports also note "full motor function in both lower extremities." (*See e.g.* T. 849 - 6/13/17; 853 - 4/17/17; 857 - 4/3/17).

touching his knees, and side bending was limited to 15 degrees with low back pain. (*Id.*) His "leg raising" was 90 degrees with low back pain and some mild left posterior thigh pain. (*Id.*) Dr. Robinson stated that the plaintiff's response to his last nerve block suggested that he may have "a considerable component of degenerative disc and joint disease in his lumbar spine." (T. 337).

Taking this medical evidence into consideration, the ALJ found that plaintiff had extensive limitations in sitting and standing when he formulated an RFC that would allow plaintiff to stand up for ten minutes after every hour of sitting. Even though consultative physician Dr. Kalyani Ganesh found no gross limitation sitting, standing, and walking, the ALJ stated that "observations of diminished spinal movement suggest postural limitations beyond what Dr. Ganesh opines." (T. 24). As a result, the ALJ found that plaintiff would have to be allowed to sit at his work station and continue to work for 10 minutes in a seated position after every hour of standing. (T. 21). This is consistent with the evidence showing that plaintiff cannot sit for long periods of time before changing positions, and consistent with his testimony that he could not sit or stand for long periods of time.

Plaintiff argues that Dr. Ganesh's use of the words "mild to moderate" limitation for lifting was too vague, and therefore, "useless" in determining plaintiff's RFC. (Pl.'s Br. at 18). "To be sure, a consultative examiner's report which concludes that a plaintiff's condition is "mild" or "moderate," without additional information, does not allow an ALJ to infer that a plaintiff is capable of performing the exertional requirements of work." *Pealo v. Comm'r of Soc. Sec.*, No. 3:17-CV-0149 (GTS/WBC),

2017 WL 5891772, at *5 (N.D.N.Y. Oct. 30, 2017); *see Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (The consultative examiner's "use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [the plaintiff] can perform the exertional requirements of sedentary work."), *superceded by regulation on other grounds by*, 20 C.F.R. § 404.1560(c)(2)); *see also Bartrum v. Astrue*, 32 F. Supp. 3d 320, 331 (N.D.N.Y. 2012).

However, the courts in this district have consistently held that a consultative examiner's opinion which utilizes such terminology may not be rendered useless, where the conclusion is "well supported by [the examiner's] extensive examination[,]" or where the vague language may be rendered "more concrete" by the facts in the underlying opinion and other opinion evidence in the record. *Pealo,* 2017 WL 5891772, at *3-4 (other citations omitted); *see also Genito v. Comm'r of Soc. Sec.*, No. 7:16-CV-0143 (GTS), 2017 WL 1318002, at *8 (N.D.N.Y. April 7, 2017). In addition, "[m]oderate" lifting limitations have been found to be consistent with an ability to do light work." *Amanda v. Saul*, No. 8:18-CV-1221, 2019 WL 5865388, at *8 n.3 (N.D.N.Y. Nov. 8, 2019) (citing cases).

First, the ALJ gave Dr. Ganesh's opinion only "partial" weight. Plaintiff states that the ALJ failed to "explain" how Dr. Ganesh's one-time observation that plaintiff had lumbar flexion to sixty degrees and intact grip strength had any bearing on whether plaintiff could occasionally lift up to ten pounds, reach, and handle, or how that would negate his inability to be "on-task" sufficiently to sustain substantial gainful activity.

(Pl.'s Br. at 18). The ALJ did not rely solely on Dr. Ganesh's report in making his determination that plaintiff could perform light work with additional restrictions. Plaintiff's full grip strength, full cervical spine range of motion, and full upper and lower body motor functions do have a bearing on plaintiff's ability to lift.[11] They support a finding of "mild to moderate" limitation in lifting. The ALJ also discussed these findings in another section of his analysis. (*See* T. 23).

While the ALJ did not mention every single medical report when he was discussing Dr. Ganesh's opinion, and when the ALJ was setting forth the plaintiff's RFC, his analysis is supported by substantial evidence in the record as a whole. As stated above, an ALJ is not required to "reconcile explicitly every conflicting shred of medical testimony," *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (citation omitted), and "[t]here is no absolute bar to crediting only portions of medical source opinions." *Younes v. Colvin*, No. 1:14-CV-170 (DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015). It is clear in this case, that the ALJ considered the entire record in giving the treating physicians' MSSs "limited weight," including their opinions of whether the plaintiff would miss work a certain number of days per month or be off-task 30% of the work day due to his impairments. (T. 24). If the ALJ bases his RFC on substantial evidence in the record, he may reject such findings. *See Smith v. Berryhill*, 740 F. App'x 721, 725-26 (2d Cir. 2018) (rejecting the treating physicians' opinions of plaintiff's ability to remain on-task when there is other

---

[11] The definition of light work requires "lifting **no more than** 20 pounds at a time with frequent lifting and carrying objects weighing **up to** ten pounds." 20 C.F.R. § 404.1567(b); Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5 (emphasis added).

substantial evidence in the record for the ALJ's conclusion). Thus, this court finds that the ALJ properly weighed the treating physicians' MSS reports, together with all the evidence of record.

Finally, plaintiff argues that although the ALJ found plaintiff's cervical degenerative disc disease and his carpal tunnel syndrome "severe" at step two of the analysis, he erred in failing to incorporate those impairments into plaintiff's RFC and in providing no explanation for their absence.[12] Plaintiff argues that the ALJ erred in failing to incorporate any reaching, handling, fingering, or neck limitations that would otherwise be indicative of someone with severe cervical degenerative disc disease or carpal tunnel." (Pl.'s Br. at 20).

Plaintiff's argument is unfounded. A discussion of these impairments is prominent in the RFC section of the ALJ's analysis. The ALJ specifically considered plaintiff's neck pain (caused by his cervical impairment) and his carpal tunnel syndrome in the RFC analysis, including a citation to the "imaging of claimant's spine" and "nerve testing showing radiculopathy and neuropathy." (*See* T. 23-24). As the defendant correctly notes, the fact that a plaintiff's impairment is severe at step two does not necessarily mean that the impairment imposes functional limitations that must be incorporated into the RFC. *Quimby v. Comm'r of Soc. Sec.*, No. 1:09-CV-20, 2010 WL 2425903, at *18 (D. Vt. Apr. 13, 2010) (citations omitted). "A claimant's residual functional capacity must, of course, be evaluated with due respect to all impairments,

---

[12] Plaintiff lists this as a separate argument, but he is essentially arguing that there is another reason why the ALJ's RFC is not supported by substantial evidence. Thus, the court will consider the plaintiff's last argument together with its RFC/Treating Physician analysis.

severe or not.  But this rule does not compel the further conclusion that every impairment must correlate with some discrete limitation at Step Four." *Perez v. Colvin*, No. 3:13-CV-868, 2014 WL 4852848, at *2 (D. Conn. Sept. 29, 2014) (citations and footnote omitted).

In this case, the ALJ discussed both of these impairments fully, stating that, notwithstanding the carpal tunnel syndrome, "plaintiff had full upper extremity strength and sensation during neurological testing in October 2015." (T. 23).  The ALJ also stated that plaintiff had full cervical spine range of motion during the 2015 examination and again in examinations from January 2015 and July 2017. (*Id.*)  Plaintiff had full grip strength during Dr. Ganesh's examination. (T. 23).  The ALJ concluded that "[t]he claimant's spinal conditions, ***taken together***, prevent him from climbing ladders and limit him to occasional postural tasks such as stooping and crouching.  Overall, the claimant remains capable of performing light exertion." (T. 23) (emphasis added). Thus, the ALJ did consider plaintiff's cervical disc disease and his diagnosis of carpal tunnel syndrome in formulating the RFC.  The ALJ's decision is supported by substantial evidence.

**WHEREFORE**, based on the above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED** and the complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for **DEFENDANT**.

Dated: January 16, 2020

Hon. Andrew T. Baxter
U.S. Magistrate Judge